Argued and submitted February 19, reversed and
remanded for new trial June 9, 1982

STATE OF OREGON,
*Respondent,*

*v.*

FREDERICK GEORGE MUSKOPF,
*Appellant.*

(No. 80-2020-C, CA A21564)

646 P2d 40

John Daugirda, Deputy Public Defender, Salem, argued
the cause for appellant. With him on the brief was Gary D.
Babcock, Public Defender, Salem.

James E. Mountain, Jr., Deputy Solicitor General,
Salem, argued the cause for respondent. With him on the
brief were Dave Frohnmayer, Attorney General, and
William F. Gary, Solicitor General, Salem.

Before Gillette, Presiding Judge, and Joseph, Chief Judge, and Young, Judge.

YOUNG, J.

## YOUNG, J.

Defendant appeals his conviction for burglary in the first degree. ORS 164.225. He contends that evidence of telephone calls made to the Josephine County sheriff's office after the burglary was improperly admitted, because any relevance of such evidence was outweighed by its prejudice. We reverse and remand for a new trial.

The incident leading to this charge took place on December 9, 1980. That morning defendant had visited his mother and stepfather. Defendant's stepfather, Sid Pyle, complained that a neighbor's son, David Capers, had been stealing gasoline from defendant's mother's car. Pyle had stayed up all night with a gun watching for the youth to return. Defendant left and drove to the Capers' home at about 9 a.m. When he got out of his car, the Capers' two dogs tried to bite him. According to the state's evidence, he rushed into the house without knocking. He went into the bedroom where the Capers were sleeping and began to shout at them, accusing their son David of stealing gasoline and accusing Frank Capers of owing money for a car that he had bought from defendant. Dorothy Capers, the mother, testified that defendant had kept one hand in his pocket and asked her if she had ever seen a. 44 Magnum.

David Capers came into the bedroom and forced defendant out into the yard. Defendant accused David of stealing gasoline and asked him if he wanted to see a. 44 Magnum. David was not interested. He returned to the house, and defendant left.

The Capers called the sheriff. After investigating at the Capers' residence, deputies went to the Pyle home and asked if defendant was there. Pyle was hostile and told the deputies to leave. Deputies were stationed around the house and remained there until a search warrant was obtained. A search was conducted at about 4 or 5 p.m., but defendant was not found. He was arrested at his own home two days later.

The indictment charged that defendant did

"* * * unlawfully and knowingly enter and remain in a building, to wit: a dwelling * * * with the intent to commit the crime of menacing therein * * *."[1]

Defendant admitted going to the Capers' home. He stated that he had rushed to the door because the dogs were trying to bite him and that he had knocked quickly and then gone inside. He said that someone had called for him to come to the bedroom and there he had asked the Capers to stop David from stealing gasoline because defendant was afraid that his stepfather would shoot David if he saw him around the cars again. He testified that he had gone to the Capers' house only to prevent trouble.

■ There were seven telephone calls by defendant to the sheriff's office after the incident, the first around 1 p.m. on December 9, and the last on December 11.[2] The trial court admitted testimony about the telephone calls in evidence, finding that they might indicate flight and defendant's guilty knowledge. Defendant objected to evidence of six of the calls, arguing that they were not relevant to any issue in a prosecution for burglary with intent to commit menacing and that the prejudicial impact of the evidence outweighed its probative value. Only two of the calls merit discussion.[3]

About 4 p.m. on December 10, the day after the alleged burglary, a dispatcher received a call at the sheriff's office. He testified to the gist of defendant's call:
"* * * [I] received a phone call from a male subject who said only that one of my deputies had been shot and killed at Western Riffle and you better get someone out there."

---

[1] ORS 163.190 provides, in pertinent part:

"(1) A person commits the crime of menacing if by word or conduct he intentionally attempts to place another person in fear of imminent serious physical injury."

[2] The telephone calls were tape recorded. A deputy sheriff, who had known defendant for several years, listened to tape recordings of six of the calls. He identified defendant as the caller because defendant's voice was "different than most."

[3] In the interest of brevity, we decline to discuss four of the telephone calls. They were relevant, however slight, to show flight or guilty knowledge. We cannot say that the trial court abused its discretion in admitting evidence of those calls.

This telephone call was a false report. About 3 a.m. on December 11, another dispatcher received a telephone call from defendant, who stated:

> "This is Capers on Demaray, we have an emergency out here, get someone out here."

It was also false.

The considerations for the admission of such evidence were set out in *Carter v. Moberly,* 263 Or 193, 200-01, 501 P2d 1276 (1972), and applied in a criminal case in *State v. Madison,* 290 Or 573, 579, 624 P2d 599 (1981):

> "* * * If [the trial judge] finds the evidence to have no probative value, he must exclude it. If, on the other hand, it does tend to establish a fact in issue, and no contrary considerations are present in the particular case, the evidence must be admitted. Between the two extremes, however, is an area in which further judgment must be exercised. If the evidence has some probative value, but also presents difficulties such as [undue prejudice, consumption of undue time, or unfair surprise], the judge must determine whether the value of the evidence outweighs, or is outweighed by, the offsetting considerations. We sometimes call the exercise of this kind of judgment 'discretion.' Its exercise requires the judge to weigh the value of the evidence in light of all the circumstances of the particular case, and his conclusion, if it is reasonable, will not be disturbed on appeal. Precedent is of little value in reviewing such cases, because even when cases involve similar issues and similar types of evidence, the other factors which may properly influence the trial court's ruling are highly variable. We simply determine whether, on the facts of the particular case, the trial court's ruling was within the reasonable or permissible range. We need not determine whether his ruling was the only one possible. It may be that the record will support either admission or exclusion; if so the trial court's ruling will be affirmed, regardless of which solution we would prefer."

■ Applying the *Carter* analysis, we conclude that the testimony about the two telephone calls was not properly admitted. The fact that defendant called in a false report of a shooting the day after the alleged crime is not probative of any issue that the state is entitled to prove in the trial of the burglary charge. Although the false report of an

emergency at the Caper's residence might indicate some animosity on the part of defendant toward the victims and thus be relevant to defendant's intent two days before, it tends more to show that defendant is a "bad man." *State v. Manrique,* 271 Or 201, 212, 531 P2d 239 (1975). On balance, whatever probative value the evidence may have is outweighed by its prejudicial impact.[4] We conclude, therefore, that evidence of the two telephone calls was erroneously admitted.

The state contends that even if the admission of the evidence of the telephone calls was erroneous, the error was harmless because that evidence was unlikely to have affected the result. *State v. Van Hooser,* 266 Or 19, 511 P2d 359 (1973). We do not agree. It is likely that a jury, after hearing testimony that defendant falsely reported the shooting of a deputy and falsely reported an unspecified emergency, would be more willing to believe that defendant burst into the Capers' home and threatened them. Defendant's version of what had occurred at the Capers' home on the morning of December 9 was not completely unbelievable. The interpretation that the jury gave the confrontation between defendant and the Capers might well have been influenced by evidence that defendant is the type of person who would make false reports of emergencies to the sheriff's office, including a false report of the shooting death of an officer.

Reversed and remanded for a new trial.

---

[4] Initiating a false report of an emergency to a law enforcement agency is a crime. *See* ORS 162.375.